966 F.2d 747
 140 L.R.R.M. (BNA) 2361, 60 USLW 2780
 FEDERAL LABOR RELATIONS AUTHORITY, Petitioner in 90-3690,
v.
U.S. DEPARTMENT OF the NAVY, Navy Ships Parts Control
Center, and U.S. Department of the Navy, Navy Fleet Material
Support Office, and U.S. Department of the Navy, NAVSEA
Logistics Center, and U.S. Department of the Navy, Navy
Publishing and Printing Service, Respondents,
American Federation of Government Employees, Intervenor.
U.S. DEPARTMENT OF the NAVY, Navy Ships Parts Control
Center, and U.S. Department of the Navy, Navy Fleet Material
Support Office, and U.S. Department of the Navy, NAVSEA
Logistics Center, and U.S. Department of the Navy, Navy
Publishing and Printing Service, Petitioners in 90-3724,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent.
 Nos. 90-3690, 90-3724.
 United States Court of Appeals,
Third Circuit.
 Argued May 9, 1991.
Reargued Feb. 19, 1992.
Decided May 26, 1992.
As Amended May 29, 1992.
 
 William E. Persina (argued), William R. Tobey, Pamela P. Johnson, Federal Labor Relations Authority, Washington, D.C., for petitioner in 90-3690.
 Mark D. Roth, American Federation of Government Employees, Washington, D.C., Stuart A. Kirsch (argued), American Federation of Government Employees, College Park, Ga., for intervenor petitioner in 90-3690.
 Stuart M. Gerson, Leonard Schaitman, Sandra Wien Simon (argued), Lori M. Beranek, U.S. Dept. of Justice, Civ. Div., Appellate Staff, Washington, D.C., for respondents in 90-3690.
 Elaine D. Kaplan, Gregory O'Duden, Washington, D.C., for amicus-petitioner in 90-3690.
 Argued May 9, 1991.
 Before: MANSMANN, NYGAARD and ROSENN, Circuit Judges.
 Reargued Feb. 19, 1992.
 Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 The Federal Labor Relations Authority seeks enforcement of its order requiring that the United States Department of the Navy disclose to a union, designated an exclusive bargaining representative, the home addresses of employees within a particular bargaining unit. Our inquiry focuses on whether disclosure of these home addresses is permissible under either of two exceptions to the Privacy Act: 1) Exemption 6 of the FOIA, 5 U.S.C.A. § 552(b)(6), which exempts from disclosure only "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C.A. § 552a(b)(2); and 2) disclosure "for a routine use as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section." 5 U.S.C.A. § 552a(b)(3).
 
 
 2
 With respect to the FOIA exception, the Navy urges that we reconsider our previous decision of United States Dep't of the Navy v. FLRA, 840 F.2d 1131 (3d Cir.), cert. dismissed, 488 U.S. 881, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988) (holding that the FOIA exception permits disclosure) in light of the Supreme Court's decision in United States Dep't of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). Because we held that disclosure was permissible under the FOIA exception, we did not address the routine use exception in Dep't of the Navy.
 
 I.
 
 3
 This controversy arose in January of 1988, when the American Federation of Government Employees, Local 1156, AFL-CIO (Union), the intervenor in this case and a certified exclusive bargaining unit representative under the Labor Statute,[1] requested that five Navy Commanding Officers supply the names and home addresses of all non-supervisory employees within the bargaining unit.[2] As a factual matter, it is undisputed that the Navy has provided the Union with the names of all of the bargaining unit employees and that the Union possesses the home addresses of its members. At issue remain only the home addresses of bargaining unit employees who have neither joined the Union nor consented to the disclosure of their home addresses to the Union.
 
 
 4
 After its requests were denied, the Union filed a charge against the Navy for unfair labor practices in violation of the Labor Statute, 5 U.S.C.A. § 7116(a)(1), (5) and (8). J.A. at 62. An administrative law judge subsequently granted summary judgment in favor of the Union, and by order dated September 28, 1990, the FLRA affirmed the ALJ in a brief opinion that incorporated the reasoning of its lengthier opinion in United States Dep't of the Navy, Portsmouth Naval Shipyard, 37 F.L.R.A. (No. 39) 515 (1990), issued just two days earlier.[3] United States Dep't of the Navy, Navy Ships Parts Control Center, 37 F.L.R.A. (No. 58) 722 (1990) (Navy Ships Parts Control Center ). The FLRA then petitioned our court for enforcement and the Navy petitioned for review. Our appellate jurisdiction over these cross-petitions is premised upon 5 U.S.C.A. § 7123(b) and (a), respectively.
 
 
 5
 We review FLRA determinations under the arbitrary and capricious standard set forth in the Administrative Procedure Act, 5 U.S.C.A. § 706(2)(A). See Dep't of the Navy, 840 F.2d at 1134. We also accord "considerable weight" to the agency's construction of its own enabling statute, the Labor Statute, but less deference to the FLRA's construction of the FOIA or the Privacy Act. Id.
 
 II.
 
 6
 In the Labor Statute, Congress plainly stated that collective bargaining "safeguards the public interest" and "contributes to the effective conduct of public business;" therefore, "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C.A. § 7101(a)(1)(A), (B) and (2). To achieve this goal, the Labor Statute provides for the award of exclusive representation to labor organizations, 5 U.S.C.A. § 7111, and imposes interrelated rights and obligations upon an exclusive bargaining representative, 5 U.S.C.A. § 7114. The disclosure provision at issue here, section 7114(b)(4), also outlines the obligations of both the exclusive bargaining representative and the government agency "to negotiate in good faith." In particular, the Labor Statute specifies that "[a]n exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership. " 5 U.S.C.A. § 7114(a)(1) (emphasis added); S.Rep. No. 969, 95th Cong., 2d Sess. 104, reprinted in 1978 U.S.C.C.A.N. 2723, 2826. See Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1263, 489 U.S. 527, 531, 109 S.Ct. 1282, 1285, 103 L.Ed.2d 539 (1989); Dep't of the Navy, 840 F.2d at 1135. Thus, irrespective of a bargaining unit employee's union membership, the Union shoulders a statutory mandate to represent that individual's interests.
 
 
 7
 Subsection (b) imposes upon the exclusive bargaining representative the "duty to 'negotiate in good faith' [which] include[s] approaching negotiations with a sincere resolve to reach an agreement, being represented at negotiations by [an] appropriate representative prepared to discuss and negotiate on all negotiable matters." S.Rep. No. 969, 95th Cong., 2d Sess. 104, reprinted in 1978 U.S.C.C.A.N. 2826. In this manner, the Labor Statute affixes intertwined rights and obligations upon the exclusive representative toward bargaining unit employees, without regard to union membership. Thus, the Union has sought disclosure of these home addresses under the Labor Statute that describes collective bargaining as in the public interest and imposes obligations upon exclusive bargaining representatives to further that purpose.
 
 
 8
 The Labor Statute's disclosure provision requires government agencies to furnish data "which is normally maintained by the agency in the regular course of business" and "which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining ..." "to the extent not prohibited by law." 5 U.S.C.A. § 7114(b)(4) (emphasis added).[4] The Navy contends that the Privacy Act, 5 U.S.C.A. § 552a, prohibits disclosure to the Union of nonmember employees' home addresses absent employee consent unless one of twelve exceptions applies. See also FLRA v. United States Dep't of the Treasury, 884 F.2d 1446, 1448 (D.C.Cir.1989) (deferring to the FLRA's determination that "to the extent prohibited by law" refers to the Privacy Act), cert. denied, 493 U.S. 1055, 110 S.Ct. 863, 864, 107 L.Ed.2d 948 (1990). As mentioned previously, only two exceptions are presented here: the FOIA and the routine use exceptions to the Privacy Act. 5 U.S.C.A. § 552a(b)(2) and (3).
 
 III.
 
 9
 A preliminary question posed is whether under the Labor Statute these home addresses are "necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining; ...." 5 U.S.C.A. § 7114(b)(4)(B). Because an exclusive representative bears a statutory duty to represent the "interests of all employees ... without regard to labor organization membership," 5 U.S.C.A. § 7114(a)(1), and these employees may evidence reluctance to participate in the Union's bargaining efforts, the FLRA has taken the approach that home addresses are per se necessary to collective bargaining. The Navy contends, however, that a particularized factual finding of the availability of alternative avenues of communications must be made in each case and suggests, somewhat ambiguously, that the FLRA's failure to appraise alternatives to home addresses in this case is tantamount to a failure to find the prerequisite necessity for home addresses required for a request for disclosure under section 7114(b)(4).[5]
 
 
 10
 The FLRA took the position that disclosure of home addresses was necessary for collective bargaining initially in Farmers Home Administration Finance Office, St. Louis, Missouri (Farmers Home II ), explaining that disclosure would "enable the Union to communicate effectively and efficiently, through direct mailings to individual employees." 23 F.L.R.A. (No. 101) 788, 796 (1986). The FLRA also found, consistent with the Second Circuit opinion of American Fed'n of Gov't Employees, Local 1760 v. FLRA, 786 F.2d 554, 557 (2d Cir.1986), that "the mere existence of alternative means of communication is insufficient to justify a refusal to release [home addresses]." Farmers Home II, 23 F.L.R.A. (No. 101) at 796. Finally, the FLRA eschewed a case-by-case review approach, finding that communication by means of direct mailings was so far superior to alternatives as to render home addresses necessary regardless of alternative means of communication. Id. at 796-97; see Portsmouth, 37 F.L.R.A. (No. 39) at 522-23 (relying upon Farmers Home II and concluding that opening the record for factfinding of alternative methods of communication unnecessary). As in Portsmouth, it is undisputed that the ALJ and FLRA did not engage in factfinding in this case and relied instead on the per se rule of Farmers Home II. See Transcript of Oral Argument at 14; Navy Ships Parts Control Center, No. 2-CA-80243 (F.L.R.A. Sept. 21, 1988) (ALJ's Decision and Order) (reprinted at J.A. at 19, 22-23); Navy Ships Parts Control Center, 37 F.L.R.A. (No. 58) at 722-23.
 
 
 11
 In our 1988 panel decision in Dep't of the Navy, we did not have occasion to address the merits of Farmers Home II's per se rule. Although Dep't of the Navy followed Farmers Home II, the record before our panel contained substantial factual findings concerning the inadequacies of alternative means of communication. 840 F.2d at 1138-39. In addition, despite the per se language of Farmers Home II, counsel for the FLRA represented at oral argument that alternative methods of communication had been assessed in each case and resulted in a factual finding of necessity. 840 F.2d at 1139. Such is no longer the case, as the Portsmouth progeny clearly demonstrates.
 
 
 12
 Our first task is to determine "whether Congress has directly spoken to the precise question at issue," and if not, then "whether the [FLRA's interpretation] is based on a permissible construction of the statute." Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984). There is no contention here that the Labor Statute speaks directly to whether disclosure of home addresses is "necessary" for collective bargaining purposes; rather, Congress delegated this sort of specific determination to the FLRA in the Labor Statute. 5 U.S.C.A. § 7105(a)(1) (the FLRA "shall provide leadership in establishing policies and guidance relating to matters under this chapter"); see Bureau of Alcohol, Tobacco and Firearms v. FLRA, 464 U.S. 89, 92-93, 104 S.Ct. 439, 441-42, 78 L.Ed.2d 195 (1983).
 
 
 13
 Therefore, we employ a deferential standard of review and will accord deference to the FLRA's interpretation of "necessary" in section 7114(b)(4)(B). Chevron, 467 U.S. at 844-45, 104 S.Ct. at 2782-83; Dep't of the Navy, 840 F.2d at 1138. In Farmers Home II, the FLRA explained a satisfactory rationale for the per se rule:
 
 
 14
 [W]e find that the mere existence of alternative means of communication is insufficient to justify a refusal to release the information. Further, we find that it is not necessary for us to examine the adequacy of alternative means in cases involving requests for names and home addresses because the communication between unit employees and their exclusive representative which would be facilitated by release of names and home addresses information is fundamentally different from other communication through alternative means which are controlled in whole or in part by the agency. When using direct mailings, the content, timing, and frequency of the communication is completely within the discretion of the union and there is no possibility of agency interference in the distribution of the message. Further, direct mailings reach unit employees in circumstances where those employees may consider the union's communication without regard to the time constraints inherent in their work environments, and in which any restraint the employee may feel as a result of the presence of agency management in the workplace is not present.
 
 
 15
 23 F.L.R.A. (No. 101) at 796-97. We believe that the FLRA's interpretation of what is necessary does constitute a permissible construction of the Labor Statute.
 
 
 16
 In its brief, amicus curiae, the National Treasury Employees Union (NTEU), lends support to the FLRA's judgment by illustrating some of the difficulties it encounters in communicating with the 40 percent of its bargaining unit employees who do not belong to the union. Amicus Brief at 2. As the NTEU explains, its bargaining units are often geographically dispersed, even nationwide, and many employees work in the field without making daily office visits. The NTEU bargaining efforts are further encumbered by a union steward to employee ratio of 1/50 and workplace restraints upon using government time for union purposes. Amicus Brief at 3. The availability of home addresses therefore provides the most effective avenue of communication with nonmember employees.
 
 IV.
 
 17
 Before addressing the exceptions to the Privacy Act, a diversion into the developments in the home address litigation will aid in later framing the relevant issues. The FLRA first permitted disclosure of home addresses under the FOIA exception to the Privacy Act in Farmers Home II.[6] Starting with the premise that the "clearly unwarranted" language of Exemption 6 of the FOIA required it to tilt the balance in favor of disclosure, the FLRA characterized the public interest to include promotion of collective bargaining under the Labor Statute and identified ways in which disclosure would enable unions to better accomplish their statutory responsibilities and foster collective bargaining. 23 F.L.R.A. (No. 101) at 792-93. Adopting one court's evaluation of the employees' privacy interest in their home addresses as "not particularly compelling," see American Federation of Government Employees, Local 1760 v. FLRA, 786 F.2d 554 (2d Cir.1986) (AFGE ), the FLRA concluded that the public interest "far outweighs" the privacy interest. Farmers Home II, 23 F.L.R.A. (No. 101) at 793.
 
 
 18
 In Farmers Home II the FLRA established as well that disclosure fell within the routine use exception to the Privacy Act. 5 U.S.C.A. § 552a(b)(3). The FLRA equated the standards "necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining" in section 7114(b)(4) of the Labor Statute with "relevant and necessary to their duties of exclusive representation" in the Office of Personnel Management's Federal Register notice of a routine use. Privacy Act of 1974; Publication of Notices of Systems of Records and Proposed New Routine Use, 49 Fed.Reg. 36,956 (Sept. 20, 1984). It determined that home addresses are "necessary" for collective bargaining purposes under section 7114(b)(4) and under the routine use notice. Farmers Home II, 23 F.L.R.A. (No. 101) at 794.
 
 
 19
 In a panel opinion, United States Dep't of the Navy v. FLRA, 840 F.2d 1131 (3d Cir.1988), we held that under the FOIA exception to the Privacy Act, the privacy interest of government employees in their home addresses did not outweigh the strong public interest in collective bargaining mandated by the Labor Statute and the FOIA's policy in favor of disclosure. Dep't of the Navy, 840 F.2d at 1137.[7] Acknowledging first that the Labor Statute established that collective bargaining serves the public interest, we characterized the employees' privacy interest in their home addresses as a "meaningful interest in privacy concerning the information about their homes." Dep't of the Navy, 840 F.2d at 1135-36. We termed the "invasion of privacy effected by disclosure of ... names and addresses" as "minimal." Id. at 1137. Against this privacy interest, we weighed the public interest to determine whether disclosure "would constitute ... [a] clearly unwarranted invasion of privacy." 5 U.S.C.A. § 552(b)(6). "[M]indful ... that any consideration of exemptions under FOIA begins with 'a well-known presumption in favor of disclosure,' " Dep't of the Navy, 840 F.2d at 1135, we accorded weight to the public interest found in section 7101(a) of the Labor Statute, id. at 1136-37, and concluded that it outweighed the employees' meaningful privacy interest. Id. at 1137. Ruling disclosure available under the FOIA exception, we declined to address the routine use exception.
 
 
 20
 In its subsequent decision in Dep't of Justice v. Reporters Committee, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), the Supreme Court expanded on the character of the public and privacy interests to be balanced under the FOIA. There the Reporters Committee filed a FOIA request for the compiled criminal record ("rap sheet") of an individual involved in government contracting. At issue was whether disclosure of that individual's rap sheet to the requesters " 'could reasonably be expected to constitute an unwarranted invasion of personal privacy' within the meaning of [Exemption 7(C) of the FOIA]. 5 U.S.C. § 552(b)(7)(C) (1982 ed., Supp. V)". Reporters Committee, 489 U.S. at 751, 109 S.Ct. at 1470.
 
 
 21
 The requester argued that because the information contained in the rap sheets was of public record, albeit scattered in courthouses and police departments nationwide, the individual's privacy interest was minimal. Rejecting a "cramped" notion of privacy that because the information in the rap sheet was publicly available an individual retains no privacy interest in his or her rap sheet, the Court explained that privacy interests "encompass the individual's control of information concerning his or her person." 489 U.S. at 763, 109 S.Ct. at 1476. A "web of federal statutory and regulatory provisions," including the Privacy Act, and supplemented by state laws, that restrict rap sheet dissemination and other compiled computerized information served to bolster the individual's privacy interest. Id. at 764-65, 109 S.Ct. at 1477; see Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (a centralized computer file of persons who have been prescribed and have obtained "certain drugs for which there is both a lawful and an unlawful market," threatens privacy).
 
 
 22
 The Court also relied upon an Exemption 6 case, United States Dep't of the Air Force v. Rose, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976), to analyze the privacy interests in a rap sheet. In Rose, the Court found that the disclosure of case summaries of Air Force cadets' disciplinary reviews, redacted to eliminate identifying information would not be "clearly unwarranted." Id. at 380-81, 96 S.Ct. at 1608. Although significant, the cadets' privacy interests were outweighed by the "clearly unwarranted" balance of Exemption 6 and the policy of disclosure underlying the FOIA. In Reporters Committee the Court reasoned that if a cadet has a privacy interest in "once public but [possibly] 'wholly forgotten' [past discipline], the ordinary citizen surely has a similar interest in the aspects of his or her criminal history that may have been wholly forgotten." 489 U.S. at 769, 109 S.Ct. at 1479.
 
 
 23
 Against this defined privacy interest, the Court noted that the FOIA advocated a general philosophy of full agency disclosure concerning agency decision-making, subject to nine specifically enumerated exemptions. 5 U.S.C.A. § 552(b)(1)-(9). The Court stated that Exemption 7(C) prohibited disclosure in that case and expressly stated that it had no occasion to address Exemption 6. Reporters Committee, 489 U.S. at 762 n. 12, 109 S.Ct. at 1475 n. 12.
 
 
 24
 In balancing the interests under Exemption 7(C), the Court attempted to ascertain what "warrants" an invasion of privacy. Id. at 771, 109 S.Ct. at 1480. First, absent a claim of privilege, the identity of the requesting party has no bearing on a FOIA request. Id.; see also Landano v. Dep't of Justice, 956 F.2d 422 (3d Cir.1992) (following Reporters Committee); Committee on Masonic Homes v. NLRB, 556 F.2d 214 (3d Cir.1977). Second, the FOIA was enacted in order to provide information regarding "what the government is up to" rather than information concerning individuals. Reporters Committee, 489 U.S. at 772-73, 109 S.Ct. at 1481. Balancing the heavy privacy interest against the minimal interest of the requester in information which revealed nothing about "what the government is up to," the Court concluded that Exemption 7(C) prohibited disclosure. Id. at 780, 109 S.Ct. at 1485.
 
 
 25
 In one post-Reporters Committee case upon which the Navy relies, FLRA v. U.S. Dep't of Treasury, 884 F.2d 1446 (D.C.Cir.1989) ("Treasury"), cert. denied, 493 U.S. 1055, 110 S.Ct. 863, 864, 107 L.Ed.2d 948 (1990), the Court of Appeals for the D.C. Circuit revisited the home addresses disclosure issue in light of Reporters Committee. Distinguishing pre-Reporters Committee cases because they weighed the "special public interest in advancing collective bargaining as an aspect of the disclosure value, ... the clinching value," Treasury, 884 F.2d at 1451, that court relied upon Reporters Committee to characterize the public interest as confined to the FOIA's purpose of revealing governmental activities and expressly rejected an evaluation of the public interest "adjusted in light of" the Labor Statute's policy of advancing collective bargaining. Id. at 1451, 1453. Weighing the public interest in disclosure as something slightly more than "nothing," that court adhered to its prior view that a federal employee's privacy interest in his address is substantial and balanced the interests against disclosure. Id. at 1453; see National Ass'n of Retired Federal Employees v. Horner, 879 F.2d 873 (D.C.Cir.1989) (NARFE), cert. denied, 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990).[8]
 
 
 26
 Subsequently, in United States Dep't of the Navy, Portsmouth Naval Shipyard, 37 F.L.R.A. (No. 39) 515 (1990) ("Portsmouth "), enforcement denied, 941 F.2d 49 (1st Cir.1991), the FLRA considered and rejected the reasoning of Treasury, perceiving that its task was to "harmonize" the Labor Statute, the Privacy Act and the FOIA. In so doing, the FLRA distinguished Reporters Committee as inapposite to disclosure sought under the Labor Statute, reasoning that requests under section 7114(b)(4) of the Labor Statute cannot be evaluated without recognizing the identity of the requesting party and the interrelated rights and obligations imposed upon the unions by the Labor Statute. 37 F.L.R.A. (No. 39) at 526-27; see United States Dep't of Health and Human Services v. FLRA, 833 F.2d 1129, 1135-36 (4th Cir.1987), cert. dismissed, 488 U.S. 880, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); 5 U.S.C.A. § 7101(a) (imposing upon the union duties of fair representation, collective bargaining with employers, and providing disclosure information necessary to assist the implementation of these duties).
 
 
 27
 After refuting the contention that the Labor Statute requires a FOIA analysis divorced from the public interests of the Labor Statute, the FLRA maintained that the FOIA lacks statutory standards for characterizing the competing privacy and public interests to be weighed and that courts should employ discretion in determining the relevant public and private interests including reference to law outside the FOIA. Portsmouth, 37 F.L.R.A. (No. 39) at 530. Moreover, the FLRA noted that the privacy interest in one's home address is less compelling than one's privacy interest in a rap sheet, distinguishing Reporters Committee, and also had little commercial value. Id. at 532. Because the order under review incorporated Portsmouth, its reasoning is subject to our review.
 
 V.
 
 28
 In order to weigh whether disclosure of home addresses would be "clearly unwarranted" under Exemption 6 of the FOIA, it is necessary to identify the competing privacy and public interests. We will evaluate each seriatim and then turn to balancing them.
 
 A.
 
 29
 We have previously concluded that individuals retain a "meaningful interest in the privacy of information concerning their homes." Dep't of the Navy, 840 F.2d at 1136; see International Brotherhood of Electrical Workers, Local Union No. 5 v. United States Dep't of Housing and Urban Development, 852 F.2d 87, 89 (3d Cir.1988); see also Wine Hobby U.S.A., Inc. v. IRS, 502 F.2d 133, 136-37 (3d Cir.1974) (finding that the privacy interest in one's home address far outweighs an admitted "public interest" limited to "private commercial exploitation"). That "individuals have some privacy interest in their home addresses," we acknowledged, but we also recognized that "the invasion of privacy effected by such disclosure is not as serious as it would be by the disclosure of more personal information." Dep't of the Navy, 840 F.2d at 1136. Indeed, when balanced against the public interest served by disclosure, we found the invasion of privacy by disclosure of home addresses to be "minimal." Id. at 1137.
 
 
 30
 Reporters Committee does not alter our previous characterization of one's privacy interest in a home address as meaningful. Reporters Committee evaluated an individual's privacy interest in his or her rap sheet revealing all arrests, criminal charges and conviction. On its face this information merits a greater privacy interest ranking than one's home address because of its potential for embarrassment and humiliation. Home addresses, by contrast, warrant a lesser degree of privacy because they do not implicate embarrassing or humiliating facts. Moreover, Reporters Committee also found further support for its finding of a substantial privacy interest in the "web" of federal and state laws restricting rap sheet dissemination. No such "web" of laws restrict dissemination of home addresses.
 
 
 31
 Our previous determination that home addresses implicate a meaningful privacy interest remains valid after Reporters Committee. Without more, such as the statutory and regulatory protections afforded rap sheets, we adhere to our assessment of the privacy interest as "meaningful" in Dep't of the Navy.B.
 
 
 32
 The Navy contends that Reporters Committee alters the character of the public interest to restrict FOIA disclosure to information revealing "what the government is up to" regardless of the purposes or identity of the requesting party. If, as the Navy argues, Reporters Committee applies to the Union's request for home addresses made under section 7114(b) of the Labor Statute, then an assessment of the public interest cannot take into account the degree to which access to home addresses enhances the ability of a union to engage in collective bargaining, and the purpose of the Labor Statute to promote that activity. This would be true because the disclosure of home addresses reveals nothing directly about "what the government is up to."[9] If this is so, according to the Navy, a public interest of "zero" is clearly outweighed by a meaningful privacy interest.
 
 
 33
 Reporters Committee addressed a FOIA request under Exemption 7(C) and as the Intervenor, American Federation of Government Employees, AFL-CIO, points out,
 
 
 34
 [Reporters Committee ] did not reevaluate or even address the [Labor Statute] under which this request for information was sought; it did not address or apply the Privacy Act which is the statute that is asserted to deny the access; nor did it apply or reference the relevant exemption (b)(6) of the FOIA.
 
 
 35
 That case did not present an occasion to evaluate the Labor Statute's explicit policy favoring collective bargaining as in the public interest, nor the interrelated rights and responsibilities imposed by Congress on an exclusive bargaining representative. See Treasury, 884 F.2d at 1453.
 
 
 36
 We recognize that in the context of the case before it, the Supreme Court suggested in Reporters Committee that the identity or purpose of a requester is immaterial when a request is made under the FOIA. Reporters Committee, 489 U.S. at 771, 109 S.Ct. at 1480; see Landano, 956 F.2d at 428; Masonic Homes, 556 F.2d at 220 ("we must consider the public benefit that would result from the disclosure, to [the requester] or to anyone ..."). This case is different because here it is the identity of the requesting party--as an exclusive bargaining representative--under the Labor Statute that authorizes the union to invoke the statutory disclosure provision. As amicus curiae notes, "the [Navy's] argument has the anomalous effect of requiring [us] to rule 'clearly un warranted' under one statute (FOIA) a disclosure that Congress has determined to be clearly warranted under another law (5 U.S.C.A. § 7114(b)(4))." In view of this dysfunction and the statutory public interest in collective bargaining, it is improbable that Congress intended such an incongruous result. See also Treasury, 884 F.2d at 1457 (Ruth Bader Ginsburg, J., concurring).
 
 
 37
 Although Treasury held that "the identity of the requesting party has no bearing on the merits of his or her FOIA request," the Court of Appeals for the D.C. Circuit also stated somewhat paradoxically:
 
 
 38
 But the statement does not necessarily mean that there is no exception to the general rule that the public interest in disclosure under FOIA should be defined exclusively in terms of finding out what the "government is up to." Nothing in the passage suggests that the Court had considered and rejected the relevance of public interest objectives identified by Congress in other disclosure statutes. Moreover, the argument here is not that the identity of the requester should alter the disclosure interest, but rather that a congressional (non-FOIA) disclosure mandate might do so.
 
 
 39
 Treasury, 884 F.2d at 1453 (emphasis added).
 
 
 40
 The Labor Statute provides for collective bargaining with the government as an employer, in contrast to the FOIA's theory of providing for disclosure of governmental activity. Therefore, the issue of whether disclosure of home addresses to the exclusive bargaining representative is in the public interest differs depending upon the statute under which disclosure is sought. See United States Dep't of Health and Human Services v. FLRA, 833 F.2d 1129, 1135-36 (4th Cir.1987) (distinguishing between disclosure sought under the FOIA and the Labor Statute), cert. dismissed, 488 U.S. 880, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988). Thus, the theory underlying FOIA disclosure, as represented in Reporters Committee, is inapplicable in disclosure cases sought under the Labor Statute. As the Intervenor states,
 
 
 41
 ... it suggests total repudiation of the policies of the [Labor Statute] from which access to this information is sought. The analysis does not begin and end with the Privacy Act and FOIA, as the [Navy] asserts, but it entails special considerations embodied in the [Labor Statute] which furnishes the exclusive representative this special right to information from the Agency as employer, including a recognition of the significant public interest in collective bargaining.
 
 C.
 
 42
 Congress enacted the FOIA to reflect " 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.' S.Rep. No. 813, 89th Cong., 1st Sess., 3 (1965)." Dep't of the Air Force v. Rose, 425 U.S. 352, 360-61, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976). We are further reminded that "[the nine] limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the [FOIA]." Id. at 361, 96 S.Ct. at 1599. Consistent with its policy of disclosure, the FOIA "places the burden on the agency to justify the withholding of any requested documents." Dept. of State v. Ray, --- U.S. ----, 112 S.Ct. 541, 547, 116 L.Ed.2d 526. In keeping with this policy, disclosure has been required even when it added nothing to the public's knowledge of government workings. See United States Dep't of Justice v. Tax Analysts, 492 U.S. 136, 156, 109 S.Ct. 2841, 2853, 106 L.Ed.2d 112 (1989) (Blackmun, J., dissenting) ("[t]he result [of the holding requiring the federal agency to release court opinions to a commercial entity] is to impose the cost of obtaining the court orders and opinions upon the Government" and "adds nothing whatsoever to public knowledge of Government operations").
 
 D.
 
 43
 With these principles in mind, we now consider whether disclosure of home addresses to the union would constitute a clearly unwarranted invasion of personal privacy under the FOIA Exemption 6 exception to the Privacy Act. The FOIA does not provide legislative standards for evaluating competing privacy and public interests. As a result courts have played a creative role in evaluating the interests to be balanced, looking to the purpose of the FOIA, other statutes and the common law to characterize and weigh the competing interests. See, e.g., Reporters Committee, 489 U.S. at 764-65, 109 S.Ct. at 1477 (referring to the common law and numerous federal and state statutes to characterize a subject's privacy interest in his or her rap sheet); IBEW, Local Union No. 5, 852 F.2d at 87 (defining the public interest in terms of the purposes of the Davis Bacon Act); Masonic Homes, 556 F.2d at 214 (looking to the purposes of the National Labor Relations Act to assess the public interest).
 
 
 44
 We conclude that the strong public interest in collective bargaining outweighs the employees' meaningful privacy interest in their home addresses. Arising out of the Labor Statute's imperative that unions must represent all employees regardless of membership, the Union's need to communicate with nonmember employees does not constitute a clearly unwarranted invasion of their personal privacy in this context. The Union will possess their home addresses in order to send home mailings to nonmember employees for their information and participation. We thus hold that this minimal invasion of privacy is not clearly unwarranted in light of Congress' express promotion of federal sector collective bargaining.
 
 
 45
 The Navy argues that because the FOIA provides for disclosure to "any person," 5 U.S.C.A. § 552(a)(3), disclosure to the union would likewise permit access to federal employees' home addresses by any person armed with paper and pencil to make a FOIA request. Our holding is much more limited, however. We emphasize that only an exclusive bargaining representative may request home addresses under the Labor Statute. Any other person would need to proceed directly under the FOIA, to which the public interest parameters of Reporters Committee rather than the Labor Statute would apply. For this reason, the dissent's concern that our holding will make home addresses available to any malfeasant is unfounded.
 
 
 46
 The Navy and the dissent also sound an alarm concerning the uses to which the union might put the home addresses. The dissent foresees that the disclosure of nonmember employees' home addresses to the Union will harm these employees' privacy interests by exposing those employees to the "probability of solicitations, pressures for membership in an organization they do not wish to join, and obvious safety and harassment risks." While we are sensitive to these in the abstract, they simply command no weight in this case.
 
 
 47
 First, there is no doubt that disclosure of home addresses to the Union will add to the volume of mail received by nonmember employees. In many, if not all cases, these employees will not wish to receive Union mailings. Nevertheless, we are unpersuaded that unsolicited and undesired mailings from a union pose any greater an invasion of privacy than similar mailings from mail order houses and the like. If unsolicited union mailings are truly of no interest to a nonmember recipient, the intrusion can be rectified by simply tossing the literature into the garbage can. In this manner a nonmember would have an opportunity to scan informational material sent by the Union in an atmosphere free of any outside pressure or oversight. The invasion of an employee's privacy interest is minimal.
 
 
 48
 There is no indication on this record that the union would disseminate these home addresses to commercial enterprises or that employees would suffer anything more than some perhaps unwanted union mailings should the union obtain their home addresses. Nonetheless, the Navy asserts that a list of employees' names and addresses by bargaining unit would have value to commercial enterprises who could link a particular trade with a regular federal paycheck. Although this may be true, the Union has sought this information for collective bargaining purposes which implicates a statutorily defined public interest. Thus this case differs significantly from Wine Hobby, in which the stipulated "public interest" was strictly commercial, limited solely to acquiring a home address mailing list compiled according to family income and wine-making interest. Wine Hobby, 502 F.2d at 137; see also NARFE, 879 F.2d at 873 (seeking names and addresses of retired federal workers receiving annuities for membership drive). Lastly, unwanted mailings are an unfortunate fact of our daily existence; our annoyance with them does not rise to a privacy interest that outweighs a statutorily mandated disclosure interest.
 
 
 49
 Second, the dissent frets that the Union may visit pressures for membership upon nonmember employees. The Labor Statute clearly and unambiguously answers this concern, proscribing, as an unfair labor practice, a union from "interfer[ing] with, restrain[ing], or coerc[ing] any employee in the exercise by the employee of any right under this chapter." 5 U.S.C. § 7116(b)(1). Just as clearly, an employee's rights include "the right to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal ..." 5 U.S.C. § 7102 (emphasis added). Therefore Union pressure for membership that transgresses an employee's right to refrain freely from joining a union would be sanctioned as an unfair labor practice.
 
 
 50
 Third, the dissent reveals unwarranted apprehension when referring to "obvious safety and harassment risks." The dissent errs first in widening the Union's access to these addresses under the Labor Statute to any person's access under the FOIA. Our holding is not so far-reaching. Second, a Union misusing home address information for harassment would, as in a case of pressuring a nonmember to join, be subject to sanctions for unfair labor practices. Third, as a factual matter the employees whose addresses are subject to disclosure fall outside the category of managerial and supervisory employees and are least likely to attract job-related harassment. See 5 U.S.C. § 7103(a)(2)(B)(iii). Moreover, individuals bent on mischief have numerous means of obtaining home addresses at their disposal, for example, one could check phone book listings, deed recordings, or even follow an employee home from work.
 
 
 51
 The Navy's and the dissent's speculation far overreaches the purpose for which the information is sought--the execution of the union's statutory obligations. As the FLRA points out, moreover, employees can request that the union not release their home addresses and request that the FLRA issue a cease and desist order against the union for misuse of the information. See 5 U.S.C.A. § 7118 (authorizing the FLRA to issue cease and desist orders in appropriate circumstances). If desired, the union's safekeeping of home addresses could be a subject for collective bargaining or a condition upon which the union retains its certification as an exclusive representative. Finally, the FLRA could condition the uses to which a union may put home addresses. See, e.g., Treasury, 884 F.2d at 1450; Farmers Home II, 23 F.L.R.A. (No. 101) at 798.
 
 
 52
 Our conclusion is further supported by the fact that private sector labor unions are routinely provided the same home address information. NLRB v. Associated General Contractors of California, Inc., 633 F.2d 766 (9th Cir.1980), cert. denied, 452 U.S. 915, 101 S.Ct. 3049, 69 L.Ed.2d 418 (1981); NLRB v. Pearl Bookbinding Co., Inc., 517 F.2d 1108 (1st Cir.1975); United Aircraft Corp. v. NLRB, 434 F.2d 1198 (2d Cir.1970), cert. denied, 401 U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); Prudential Ins. Co. of Am. v. NLRB, 412 F.2d 77 (2d Cir.), cert. denied, 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969); Standard Oil Co. of Calif., Western Operations, Inc. v. NLRB, 399 F.2d 639 (9th Cir.1968); cf. NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (enforcing NLRB's ruling that disclosure of names and home addresses was relevant and necessary to candidate unions prior to an election); NLRB v. Acme Indus. Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967) (employer required to provide information needed by union to assess whether to file a grievance). Although conclusive weight need not be given to private sector labor relations precedent, cf. Fort Stewart Schools v. FLRA, 495 U.S. 641, 110 S.Ct. 2043, 109 L.Ed.2d 659 (1990) (Labor Statute is not to be read in pari materia with NLRA), nevertheless, we may look to private sector labor cases for guidance. Dep't of the Navy, 840 F.2d at 1138; see Labor Statute, 5 U.S.C.A. § 7101(a)(1) (1982) ("[E]xperience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing ... safeguards the public interest").
 
 
 53
 We need not tarry long on the Navy's rebuttal that the NLRB does not presumptively award names and addresses as does the FLRA. See, e.g., Fairfield Publishing Co., 275 N.L.R.B. (No. 2) 7 (1985) (request for names and duties of nonmember employees remanded for further factfinding); Magma Copper Co., 208 N.L.R.B. (No. 53) 329 (1974) (same; names and addresses). For the reasons advanced in Part III, we will defer to the FLRA's determination that home addresses are always relevant and necessary within the meaning of section 7114(b).
 
 
 54
 Finally, it is important to note that our holding that federal employers must disclose home addresses under the FOIA exception to the Privacy Act does not eviscerate the protections afforded federal employees by the Privacy Act. The Privacy Act will still protect from disclosure different kinds of information to which a greater degree of privacy attaches. Moreover, for certain categories of information such as wage scales and disciplinary records, an employee's privacy interest, where feasible, may be safeguarded by redacting from personnel records the names and social security numbers of employees. See Ray, 112 S.Ct. at 541 (authorizing disclosure of records after redaction of names, addresses and other identifying details); Rose, 425 U.S. at 352, 96 S.Ct. at 1592 (same); IBEW, Local Union No. 5, 852 F.2d at 87 (requiring the redaction of social security numbers).
 
 VI.
 
 55
 In the case under review, the FLRA also held that home addresses may be disclosed under the routine use exception to the Privacy Act, 5 U.S.C.A. § 552a(b)(3). Navy Ships Parts Control Center, 37 F.L.R.A. (No. 58) at 723; Portsmouth, 37 F.L.R.A. (No. 39) at 537-41. A "routine use" is defined as "the use of such record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C.A. § 552a(a)(7).[10] Each agency that maintains records shall publish in the Federal Register "upon establishment or revision a notice of the existence and character of the system of records" to include "each routine use of the records contained in the system, including the categories of users and the purpose of such use." 5 U.S.C.A. § 552a(e)(4)(D) (West 1977 & 1991 West Supp.) (emphasis added). The Office of Personnel Management, the agency maintaining the home address records at issue here,[11] has promulgated the following routine use notice:
 
 
 56
 p j. To disclose information to officials of labor organizations recognized under 5 U.S.C. Chapter 71 when relevant and necessary to their duties of exclusive representation concerning personnel policies, practices, and matters affecting working conditions.
 
 
 57
 Privacy Act of 1974; Publication of Notices of Systems of Records and Proposed New Routine Use, 49 Fed.Reg. 36,949; 36,956 (Sept. 20, 1984) (emphasis added). This regulation, in turn, requires that we inquire into the meaning of the language "relevant and necessary."
 
 
 58
 The OPM first provided its restrictive interpretation of "necessary" in similar home addresses before the Court of Appeals for the D.C. Circuit in an amicus brief, which stated:
 
 
 59
 Again, assuming, arguendo, that the information falls within the general category of information that is associated with collective bargaining, the inquiry must shift to the degree of necessity that must exist before the agency must provide that information. A major component in determining the labor organization's need for the names and home addresses of bargaining unit employees is whether adequate alternative means exist for contacting them. If adequate alternative means exist, we submit that no need for that data has been proven. Thus, we urge the Authority to adopt a standard of need composed of a "no adequate alternative means" test.
 
 
 60
 OPM Amicus Brief to the FLRA at 9 (July 14, 1986) (excerpted at Addendum D to the Brief of the Dep't of the Navy). By subsequent letter to Assistant Attorney General Richard Willard, dated nearly a year later, then-OPM Director Constance Horner verified that the OPM's amicus brief set forth the agency's official interpretation to remain in effect pending "the formal revision and issuance of a new guideline [in the Federal Personnel Manual]." Letter of OPM Director Horner (June 25, 1987) (provided in Addendum E to the Navy's brief). In her letter Horner summarized, "If adequate alternative means exist for communicating with bargaining unit employees, disclosure of home addresses is not 'necessary,' and the routine use does not apply." Id.[12]
 
 
 61
 Despite Director Horner's 1987 representation that the OPM would promptly issue a new interpretation consistent with the position taken in the amicus brief and Horner's ample opportunity to have done so, the OPM has failed to alter the existing notice of routine use or publish its interpretation. In fact, the OPM reissued its routine use notice in the Federal Register on February 5, 1990, without any alteration. Compare Privacy Act of 1974, 49 Fed.Reg. 36,956 (Sept. 20, 1984) (earlier routine use notice) with id. 55 Fed.Reg. 3802-03, 3839-40 (Feb. 5, 1990) (later unchanged routine use notice); see also Portsmouth, 37 F.L.R.A. (No. 39) at 538. We also note that contrary to Director Horner's representation that "I have instructed the appropriate staff of this Office to take action to promptly issue Appendix D to Chapter 711," Horner letter of June 25, 1987 (emphasis added), the OPM's Federal Personnel Manual still lacks any interpretation of routine uses. See Office of Personnel Management, Federal Personnel Manual, Chapter 711 (June 24, 1986) (App. D is reserved). Transcript of Oral Argument at 32; Treasury, 884 F.2d at 1454.
 
 
 62
 For these reasons, we conclude that the amicus brief interpretation has no published source. As counsel for the FLRA aptly articulated at oral argument, "One would have to be a student of home address litigation before the [FLRA] to know OPM's view...." Transcript at 37.[13]
 
 
 63
 The parties have not debated whether the amicus brief position constitutes an interpretive or substantive rule, apparently agreeing that the rule was intended only as OPM's interpretation of its regulation. Other courts of appeals to consider the issue have also cast the rule as interpretive. See Treasury, 884 F.2d at 1454-55 (evaluating whether OPM's "interpretation" is a reasonable one); Dep't of the Navy (Portsmouth), 941 F.2d at 59. Thus, although we are troubled by its substantive overtones, we will evaluate the OPM's amicus brief position as an interpretive rule. In any case, our determination remains the same: until the OPM publishes its interpretation in a manner sufficient to place the public on notice of both the existence and content of that interpretation, we will not defer to the OPM's interpretation.[14]
 
 
 64
 The Administrative Procedure Act excepts interpretive rules from the affirmative requirement of notice and comment rulemaking. 5 U.S.C.A. § 553(b)(3)(A). Thus no statutory imperative requires that an interpretive rule be promulgated by notice and comment. One scholar, Professor Kenneth Culp Davis, theorizes that in the APA Congress set only minimal requirements for rulemaking and did not intend to prohibit courts from requiring more than that statutory minimum where the interest of justice would be served. Kenneth Culp Davis, Administrative Law Treatise, § 6:31 (2d ed.1978). The notion that the interest of justice or fairness requires rulemaking most often comes into play when an interpretive rule, which ordinarily would not carry the force of law, is intended to have a substantial impact upon a regulated concern. See, e.g., Reynolds Metals Co. v. Rumsfeld, 564 F.2d 663, 669 (4th Cir.1977), cert. denied sub. nom, Reynolds Metal Co. v. Brown, 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 84 (1978). Albeit in the context of discussing a substantive rule, we have previously acknowledged the importance of notice and comment rulemaking:
 
 
 65
 Section 553 [of the APA] was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing the rules and procedures which have a substantial impact on those regulated.
 
 
 66
 Texaco, Inc. v. Federal Power Commission, 412 F.2d 740, 744 (3d Cir.1969); see also Independent Broker-Dealers' Trade Ass'n v. SEC, 442 F.2d 132, 144 (D.C.Cir.) ("elementary fairness may well require that reasonable opportunity be given for submission of views by those materially affected ..."), cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971).[15]
 
 
 67
 The OPM's interpretive rule is clearly designed to have a measurable impact. Cf. Daughters of Miriam Ctr. for the Aged v. Mathews, 590 F.2d 1250, 1255-56 n. 9 (3d Cir.1978) (examining the intent of the agency to characterize a rule as substantive or interpretive). The suggested operation of OPM's interpretation would be binding upon the FLRA and would alter the outcome in cases in which a union could not prove the lack of alternative methods of communication with nonmember bargaining unit employees. The OPM's rule would not serve as guidance to the FLRA in the adjudication of whether home addresses are "necessary" and does not leave any discretion to the FLRA in the determination of what is "necessary." The rule, by its terms, therefore, would operate as a prohibition against disclosure unless no alternative avenues of communication are proven to be available.
 
 
 68
 The FLRA urges that we should not accord deference to the OPM's interpretation because the OPM does not possesses any expertise on the subject of federal sector labor relations. Rather, the FLRA argues, we should defer to the FLRA's reasonable construction of OPM's routine use regulation. In support of this view, the FLRA points to the linguistic similarity between the "necessary" term of section 7114(b)(4)(B) and the "relevant and necessary" language of the routine use regulation and suggests that its expertise with respect to the former ought also to be deferred to in interpreting the latter.[16]
 
 
 69
 Neither of the FLRA's contentions has merit. The OPM, as the agency maintaining personnel files, has a clear legislative mandate to identify routine uses of information within its possession under the Privacy Act. 5 U.S.C.A. § 552a(e)(4). The fact that the FLRA adjudicates questions of routine use when they arise under Labor Statute requests does not require that we choose the FLRA's interpretation of what is "necessary" within the routine use in preference to the OPM's interpretation. The recent guidance of Martin v. Occupational Safety and Health Review Comm'n, --- U.S. ----, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991), suggests that we ought to accord deference to the agency entrusted by Congress with rulemaking functions. In Martin, the Secretary of Labor and the respondent Commission had issued conflicting interpretations of an ambiguous regulation. The Court addressed the question of which interpretation should properly be accorded deference given the fact that in the Occupational Health and Safety Act, Congress delegated rulemaking and enforcement functions to the Secretary and adjudicative functions to the Commission. Reasoning that the Secretary, as the rulemaker, was more likely to have established policymaking expertise in contrast to the Commission, which has powers traditionally associated with that of a reviewing court, the Court ruled that deference should be accorded the Secretary's interpretation. In keeping with the principles of Chevron, we must accord deference to the reasonable construction of the agency to which Congress entrusted responsibility. Accord Puerto Rico Maritime Shipping Auth. v. Valley Freight Sys., Inc., 856 F.2d 546, 552 (3d Cir.1988).
 
 
 70
 Nevertheless, we will not defer to an agency interpretation of its own unchanged regulation that is confined to an amicus brief and unpublished letter because this method of dissemination is wholly inadequate to notify the public of the agency's interpretation. We do not judge this interpretive rule to be reasonable as disseminated. Limited to this dissemination, discovery of this interpretation by an outside party would be extremely difficult if not impossible. If an agency seeks to apply a formal interpretation to future cases, fundamental fairness dictates that the affected public have at a minimum some constructive notice of the existence and content of that interpretation. In this case the OPM's method of dissemination does not meet even this minimal requirement of fair notice.
 
 
 71
 We also note that we lack even the assurance afforded to the Court of the Appeals for the D.C. Circuit when it considered the home address litigation and received the OPM's amicus brief interpretation directly. In this case the OPM is not represented in this litigation and we are asked to rely upon former Director Horner's five and six year-old interpretation, which also contain a representation, still dormant, that the interpretation will be formally revised and reissued. Director Horner left the OPM several years later without having followed through with her promise to formally revise the OPM's interpretation "promptly." Nor has her successor fulfilled that promise. In the absence of any subsequent action that would affirm the OPM's current adherence to an interpretation set forth in six-year old litigation and a letter, we will not defer to a stale and possibly abandoned interpretation.
 
 
 72
 We are uncertain that even the OPM would now advance its amicus brief interpretation. Thus, even were we to agree with our sister courts of appeals in the District of Columbia and First Circuits that the OPM's amicus brief interpretation combined with Horner's letter constitutes the functional equivalent of an interpretive rule deserving of deference, see Treasury, 884 F.2d at 1456; Dep't of the Navy (Portsmouth), 941 F.2d at 59-60, we are constrained to hold that the OPM's failure to fulfill its promise to publish this interpretation after a span of nearly five years erodes our confidence that the interpretation is due any deference. For these reasons the OPM's amicus brief interpretation resembles an "agency litigating positio[n] that [is] wholly unsupported by regulations, rulings, or administrative practice" to which the principle of Chevron does not apply. Bowen v. Georgetown University Hospital, 488 U.S. 204, 212, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988).[17]
 
 
 73
 Without an alternative interpretation of the routine use notice, we find that the FLRA's determination that home address litigation is "relevant and necessary" to the exclusive representative's collective bargaining efforts is not arbitrary and capricious. Clearly relevant, the FLRA has made a reasoned determination that home addresses are necessary under the Labor Statute. We will therefore enforce the order of the FLRA with respect to disclosure under the routine use exception to the Privacy Act as well.
 
 VII.
 
 74
 We will enforce the order of the FLRA and deny review to the Navy.
 
 
 75
 Circuit Judge ROTH does not join Part V of this opinion but concurs in the result to enforce the order of the FLRA and deny review to the Navy.
 
 
 76
 ALITO, Circuit Judge, with whom STAPLETON, Circuit Judge, joins, dissenting:
 
 
 77
 I dissent, essentially for the reasons set out in Judge Rosenn's opinion, as well as in the decisions of the District of Columbia, First, Second, and Sixth Circuits. See FLRA v. Department of the Navy, 963 F.2d 124 (6th Cir.1992); FLRA v. United States Dep't of Veterans Affairs, 958 F.2d 503 (2d Cir.1992); FLRA v. United States Dep't of the Navy, 941 F.2d 49 (1st Cir.1991); FLRA v. United States Dep't of Treasury Fin. Management Service, 884 F.2d 1446 (D.C.Cir.1989), cert. denied, 493 U.S. 1055, 110 S.Ct. 863, 864, 107 L.Ed.2d 947 (1990). I express no view whether the disclosures at issue would substantially further the public interest in collective bargaining or whether they are likely to produce substantial adverse effects. I do not believe that it is necessary to confront these questions in order to decide that Exemption 6 of the Freedom of Information Act, 5 U.S.C. § 552(b)(6), applies in this case. It seems clear to me that all federal employees--from Cabinet officers to GS1's--have a privacy interest of some weight in their home addresses and that there is no public interest cognizable under FOIA in the disclosure of these addresses.
 
 
 78
 ROSENN, Circuit Judge, dissenting.
 
 
 79
 I believe that the majority's evaluation of the competing privacy and public interests in this case is at variance with recently enunciated law. Its refusal sua sponte to defer to the Office of Personnel Management's (OPM) regulation on "routine use" because of insufficient public notice of the agency's interpretation of the regulation is unsupported by legal authority or sound reason. Therefore, I respectfully dissent from the majority's holding that the federal government and its agencies must disclose their employees' home addresses and that such disclosure "does not eviscerate the protections afforded federal employees by the Privacy Act."
 
 I.
 
 80
 The Union representing the employees, Local 1156 of the American Federation of Government Employees (the Union), is certified already under the Federal Service Labor-Management Relations Statute, 5 U.S.C. § 7101 (the Labor Statute), as the exclusive bargaining unit of several units of the Department of Navy Employees. Therefore, the Union does not need the employees' addresses in order to attain exclusive bargaining status for the unit employees. Thus, denying the Union the employees' home addresses is directed only to those employees who have refused to join the Union or who have refused to consent to the release of their home addresses.
 
 
 81
 These non-Union employees already are represented by the Union for collective bargaining purposes; the Union is able to bind them with respect to wages, hours, and conditions of employment. I cannot see how mandating release of their home addresses in the face of their refusal of consent advances any perceptible public interest. Disclosure can only subject the employees to probable solicitations, pressures to become members of an organization they do not wish to join, and obvious safety and harassment risks that accompany public disclosure of names and addresses of governmental employees. Hence, I disagree with the majority's conclusion that the "strong public interest in collective bargaining"--a characterization of the extent of the public interest neither supported by the record nor the law--outweighs the employees' undisputed meaningful privacy interests in nondisclosure of their home addresses.
 
 II.
 
 82
 My analysis begins with the Privacy Act, 5 U.S.C. § 552a, which generally forbids federal agencies to release information contained in employees' personnel records without the prior written consent of the individual to whom the record pertains. The Act, however, lists eleven exceptions to this general prohibition, two of which are at issue here: the release of information for a routine use, 5 U.S.C. § 552a(b)(3), and the release of information required under the Freedom of Information Act, 5 U.S.C. § 552a(b)(2) (FOIA). The FOIA, a general government disclosure statute, exempts from its provisions personnel files "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6)("Exemption 6"). To determine whether information may not be released under the FOIA's Exemption 6, the courts must balance the individual employee's privacy interest against the general public interest in disclosure.
 
 
 83
 As the majority observes, the particular balancing issue raised in this case has been extensively litigated for almost a decade. This court previously upheld the FLRA's ruling requiring federal agencies to divulge the names and home addresses of bargaining unit employees to union representatives. United States Dep't of the Navy v. FLRA, 840 F.2d 1131 (3d Cir.), cert. dismissed, 488 U.S. 881, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988). We recognized in that case a "meaningful interest in the privacy of information concerning [the employees'] homes." Id. at 1136. Nonetheless, we concluded that the public interest in collective bargaining outweighed the privacy interest. The United States Supreme Court's subsequent decision in Reporters Committee, 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), however, significantly alters the balancing calculus under the FOIA and modifies how courts may define the public interest in disclosure under the FOIA. Thus, I turn first to the most critical issue in this appeal, the definition of the public interest in the release of non-Union employees' home addresses to the exclusive bargaining agent.
 
 A. Public Interest in Disclosure
 
 84
 The majority here continues to adhere to the view that the privacy interest of federal employees must give way to the elusive and amorphous public interest in collective bargaining, notwithstanding Reporters Committee. Relying on Congress's statement when enacting the Labor Statute and on our Department of the Navy decision, the majority asserts that what is at stake in releasing these address lists to the Union is the facilitation of the collective bargaining process in the federal sector.
 
 
 85
 The majority quotes 5 U.S.C. § 7101. Maj. op. at 750. That section states that the right to "bargain collectively, and participate through labor organizations of their own choosing" "safeguards the public interest" and "contributes to the effective conduct of public business." (Emphasis added). The majority concludes that collective bargaining alone, under the Labor Statute, achieves these goals. However, Congress also intended to protect a government employee's right to choose not to join a union. Although section 7102 provides that a government employee shall have the right to join a labor organization, it also provides that an employee has the right "to refrain from any such activity, freely and without fear of penalty or reprisal, and each employee shall be protected in the exercise of such right." 5 U.S.C. § 7102 (emphasis added). The legislative history also expresses concern with protecting this right. 1978 U.S.C.C.A.N. 2824. Thus, Congress did not intend to promote collective bargaining at the expense of those who choose to refrain from union participation. Contrary to this express congressional intent, the effect of the majority's opinion would be to compel those employees who do not wish to participate in union activities to forfeit their right of privacy.
 
 
 86
 Moreover, whether collective bargaining may be advanced by providing a union with the addresses of non-members in a bargaining unit already represented by the union as the unit's exclusive bargaining agent is doubtful. As the majority acknowledges, the Union, as the exclusive bargaining agent, has the undisputed authority to bargain for and represent all employees in the bargaining unit, whether members of the Union or not. It may bind them with respect to wages, hours, and conditions of employment. In this instance, the Union even has the names of the non-members whose home addresses it seeks in these proceedings. The FLRA does not contend that denying the Union access to the address lists of the non-members in the bargaining unit will foreclose its ability to communicate with its bargaining unit employees. The FLRA admits that the Union already has available other means of communication with the non-Union member bargaining unit employees, such as worksite visits, newsletter distributions, desk drops, use of meeting rooms, the steward system, and union bulletin boards.
 
 
 87
 As we observed in Department of the Navy, the FLRA identified the incremental advantage to collective bargaining gained by home mailings as the ability to communicate with non-union employees at a time and frequency "completely within the discretion of the union" without the possibility of agency interference in the distribution of the message. 840 F.2d at 1139 (quoting Farmer's Home Administration Finance Office, St. Louis, Mo., 23 F.L.R.A. 788, 796-97 (1986) (Farmer's Home II )). The FLRA further asserts that such mailings reach unit employees where they "may consider the union's communication without regard to the time constraints inherent in their work environments," and without any feelings of restraint because of the presence of agency management in the workplace. Id.
 
 
 88
 It must be emphasized, however, that compelling the release of employees' home addresses provides the Union with the addresses of only those who previously had been inaccessible to the Union for reasons special to each employee. According to the majority, the chief advantage then to the Union of forcing the agency to release the addresses of employees is to provide the Union with the "home addresses in order to send home mailings to non-member employees for their information and participation." Maj. op. at 758-59. Thus, the FLRA's generalized reference to the public interest served by disclosure amounts to the Union's incremental advantages over other means of access to non-Union members who elect to refrain from any Union activity or who are unwilling to consent to the release of their home addresses. The record does not reveal how greater access to non-Union members significantly improves the public interest in the exclusive collective bargaining authority the Union already enjoys.
 
 
 89
 Moreover, since our previous decision in Department of the Navy, the Supreme Court's decision in Reporters Committee raises a formidable obstacle to the facilitation of collective bargaining as the relevant public interest in disclosure. In that case, the Court significantly narrowed the scope of disclosure interests which could be considered for purposes of balancing under the FOIA. In Reporters Committee, CBS news correspondents sought to compel the FBI under the FOIA to release the "rap sheets" for one Charles Medico. These rap sheets included information about Medico's criminal history, some of which already was available publicly in state court records, as well as date of birth and physical characteristics. The Department of Justice refused to release the information. Although conceding that the rap sheets were law enforcement records, it contended that the information was exempt from FOIA disclosure because its release "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C) ("Exemption 7(C)").
 
 
 90
 Upholding the Government's refusal to release the data, the Court held that the only disclosure interests which counted under Exemption 7(C) of the FOIA were interests related to the FOIA's central purpose, "to open agency action to the light of public scrutiny." 489 U.S. at 772, 109 S.Ct. at 1481 (quoting Dep't of Air Force v. Rose, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976)). The Court further noted that the gravity of the public interest in disclosure does not turn upon the identity or particular purpose of the requesting party; "the rights of the two press respondents [seeking the rap sheet information] are no different from those that might be asserted by any other third party, such as a neighbor or prospective employer." Id. at 771, 109 S.Ct. at 1480.
 
 
 91
 The Court's analysis of Exemption 7(C) applies to the substantially similar Exemption 6 as well. FLRA v. United States Dep't of Treasury, 884 F.2d 1446, 1451 (D.C.Cir.1989), cert. denied, 493 U.S. 1055, 110 S.Ct. 863, 107 L.Ed.2d 947, 948 (1990). Indeed, the courts considering this question after Reporters Committee almost unanimously have held that the only disclosure interest relevant to Exemption 6 is the interest in ascertaining the character or conduct of the government agency. See, e.g., FLRA v. United States Dep't of Veterans Affairs, 958 F.2d 503 (2d Cir.1992); FLRA v. United States Dep't of Navy, 941 F.2d 49, 56-57 (1st Cir.1991); Hopkins v. United States Dep't of HUD, 929 F.2d 81, 88 (2nd Cir.1991); Ray v. United States Dep't of Justice, 908 F.2d 1549, 1555 (11th Cir.1990) rev'd on other grounds, --- U.S. ----, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991); United States Dep't of Treasury, 884 F.2d at 1451. But see FLRA v. Dep't of Commerce, 954 F.2d 994 (4th Cir.1992).
 
 
 92
 Recently, the United States Supreme Court expressly extended the Reporters Committee standard to an Exemption 6 case. United States Dep't of State v. Ray, --- U.S. ----, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991). In Ray, the Court stated:
 
 
 93
 As we have repeatedly recognized, FOIA's basic policy of "full agency disclosure unless information is exempted under clearly delineated statutory language," ... focuses on the citizens' right to be informed about "what their government is up to." Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose. Department of Justice v. Reporters Committee, 489 U.S. at 773 [109 S.Ct. at 1481] (quoting Department of Air Force v. Rose, 425 U.S. at 360-61 [96 S.Ct. at 1599] (internal citations omitted).
 
 
 94
 112 S.Ct. at 549. The Court agreed that the public interest under the FOIA was knowing whether the State Department had adequately monitored Haiti's compliance with its promise not to prosecute political returnees. Contrary to the Court of Appeals, however, the Court concluded "that this public interest has been adequately served by disclosure of the redacted interview summaries and that disclosure of the unredacted documents would therefore constitute a clearly unwarranted invasion of the interviewees' privacy."
 
 
 95
 In light of this substantial change in FOIA law, the public interest in collective bargaining that previously had been balanced in favor of disclosure because of the Labor Statute may no longer be considered in balancing the competing interests implicated in an Exemption 6 inquiry. See Dep't of Treasury, 884 F.2d at 1451-53. Unless the names of the employees and their home addresses can be seen as communicating information about government operations, Exemption 6 of the FOIA prevents their release. Because this information is not relevant to monitoring government operations, it should not be released.
 
 
 96
 The majority declares that the Court's holding in Reporters Committee is inapplicable to this case because the request for employees' home addresses did not originate as a straight FOIA request but as a request by the Union under section 7114(b)(4) of the Labor Statute, which in turn implicates the Privacy Act and ultimately the FOIA. See United States Dep't of the Navy, Portsmouth Naval Shipyard, 37 F.L.R.A. (No. 39) 515, 526-27 (1990) (Portsmouth ). At oral argument, the FLRA argued "that this case begins and ends in the Labor Statute."
 
 
 97
 I do not think that the plain meaning of section 7114(b)(4) of the Labor Statute supports the majority's attempt to distinguish Reporters Committee. That section requires employers to provide necessary information to federal sector union representatives only "to the extent not prohibited by law." Thus, Congress recognized the possible limitations of other statutory and decisional law. Nothing in the text of this section lessens the full thrust of such prohibiting laws; no reference is made to the independent public interest advanced by the Labor Statute. The majority interprets this statute to modify the FOIA itself by relying on the federal sector labor statute's own general objectives. Such an imaginative interpretation finds no support in the text of the statute; "to the extent not prohibited by law" notably lacks any qualification or modification. Therefore, I agree with Judge Ruth Bader Ginsburg that, although having begun with the federal sector labor statute, one ends up "wholly within the FOIA's domain." Dep't of Treasury, 884 F.2d at 1457 (Ruth Bader Ginsburg, J., concurring). See also FLRA v. Dep't of Navy, 941 F.2d 49, 57 n. 11 ("In light of the Supreme Court's clear statement of FOIA principles in Reporters Committee, we do not think a distinction in the relevant 'public interest' may any longer be drawn where the information request was made under the Labor Statute rather than under the FOIA directly.").
 
 
 98
 Here, we have a situation, not uncommon to statutory interpretation, where one statute implicates another which in turn refers to other independent legislation. The FLRA asks us to adopt a wholly impracticable new tenet of statutory construction which views a phrase in an earlier statute as altering the customary interpretation of a different phrase in a later statute by implanting therein the earlier statute's specific objectives. This self-serving interpretive technique presumes that Congress never considered the proper balancing of the various statutory interests. The Navy argues, and I agree, that when Congress in 1978 fashioned the phrase "to the extent not prohibited by law," it undoubtedly had in mind the Privacy Act enacted four years earlier. This sequence of legislative events suggests that Congress added this limiting provision to assure that the protections afforded by the recently enacted Privacy Act would not be attenuated by the Labor Statute's disclosure section. Congress obviously exercised its judgment that a law which prohibits the disclosure of information prevails over other statutory disclosure sections.
 
 
 99
 In light of such an unambiguous provision, I believe that we must refrain from accomplishing indirectly through expansive judicial construction what Congress elected not to do by simple legislation. The FLRA calls such construction "harmonizing." On the contrary, it sounds dissonant to me. One hears little harmony when the distinctive positions of these three statutes are dominated by the FLRA's voice that emphasizes the interest in federal sector collective bargaining above the Privacy Act's solicitude for the privacy of federal employees' personnel files. Indeed, each statute is presumed to be in harmony with others, and courts must give each the full benefit of the interpretation laid down by the United States Supreme Court.
 
 
 100
 The FLRA next contends that applying the narrow understanding of "public interest" adopted by the Court in Reporters Committee to requests arising out of section 7114 would "gut" that disclosure section, making it more unlikely that documents which are now readily available to federal sector unions, such as employee disciplinary records, will be provided to the Union in the future. The FOIA, however, is not the only exception to the Privacy Act's prohibition of the release of employee information. Information useful to union representation and negotiation may be obtainable under other exceptions to the Privacy Act, most notably the "routine use" exception. 5 U.S.C. § 552a(b)(3). Indeed, there are over thirty routine uses for government maintained records published by the OPM. 49 Fed.Reg. 36,949, 36,956.
 
 
 101
 In addition, the Privacy Act only bars release of individuals' records without their consent; the Union can acquire any information merely by asking the represented employees to authorize the release. Thus, when a union is representing the interests of particular employees engaged, for example, in a dispute with a federal employer, the employees can readily authorize the union's access to any necessary personal information contained in their personnel files. Further, when a union seeks general information relevant to a large number of employees, such as payroll data, such information can be depersonalized merely by redacting the names or other information identifying individual employees. Therefore, the Privacy Act hinders only the Union's unauthorized access to personal, privacy-invasive information about a particular employee or employees. Such hindrance is easily surmountable with the Union members' cooperation and should not seriously hamper the Union in its effort to fulfill its responsibilities as the employees' bargaining agent.
 
 
 102
 Rejecting the majority's conclusion that Reporters Committee is inapposite here, I believe that the Union must demonstrate a reason for disclosure that meets the FOIA analysis articulated by the Court. In light of the intervening change in the law controlling this issue, we thus must reconsider our pre-Reporters Committee decision in Department of the Navy, 840 F.2d at 1136-37. In that case, we relied exclusively on the public interest in fully-informed collective bargaining in the federal sector, an interest not directly related to the FOIA's purpose in opening to scrutiny a government agency or department. The release of these Navy employees' addresses to the Union by itself does not reveal any information about the operation or character of the Department of the Navy.[1] Thus, "collective bargaining" does not qualify as a public interest directly served by disclosure of names and home addresses of federal employees.
 
 B. Privacy Interest
 
 103
 Confronted here with no FOIA-related public interest, we need only the barest individual privacy interest to require us to deny the Union's request to compel disclosure of the requested information. That obstacle is easily surmounted because "this court's case law recognizes that individuals generally have a meaningful interest in the privacy of information concerning their homes which merits some protection." Dep't of Navy, 840 F.2d at 1136; see also I.B.E.W. Local Union No. 5 v. United States Dep't of HUD, 852 F.2d 87, 89 (3d Cir.1988). As acknowledged by the majority, our assessment of the privacy interest as meaningful remains untouched by Reporters Committee. Maj. op. at 756.
 
 
 104
 In light of the exclusion of collective bargaining as a relevant public interest, I believe this case merits a fuller amplification of the privacy interest at issue. In Wine Hobby, USA, Inc. v. United States Internal Rev. Service, 502 F.2d 133 (3d Cir.1974), a case relied on by Department of the Navy, we observed that "there are few things which pertain to an individual in which his privacy has traditionally been more respected than his own home." Id. at 137; accord Heights Community Congress v. Veteran's Admin., 732 F.2d 526, 529 (6th Cir.), cert. denied, 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 398 (1984). Indeed, from antiquity one's home has been likened to a castle into which not even an uninvited king may enter. See Rowan v. United States Post Office Dep't, 397 U.S. 728, 737, 90 S.Ct. 1484, 1490-91, 25 L.Ed.2d 736 (1970). The home as a sanctum from the searching eyes and ears of the government is a principle enshrined as a constitutional tenet by the Fourth Amendment's prohibition against unreasonable searches of the home, no less a refuge than the privacy of "persons, papers, and effects."
 
 
 105
 Even today, when sophisticated mail and telephone marketing techniques have rendered most homes an easy mark for an astonishing variety of unwanted sales pitches, opinion polls, and other solicitations, the fundamental principle that a person has a right to keep out unwanted intruders "has lost none of its vitality." Id. at 737, 90 S.Ct. 1484. No illustration of the meaningful importance of privacy in one's home address is more vividly portrayed than in the recent slaying of Judge Robert S. Vance of the United States Court of Appeals for the Eleventh Circuit. He was killed in the opening of a package containing a pipe bomb that was mailed to his home in Mt. Brook, Alabama. The individual who sent the bomb, Walter Leroy Moody, Jr., also sent death threat letters to all Eleventh Circuit Court of Appeals judges. United States v. Moody, 762 F.Supp. 1491 (N.D.Ga.1991). Moody had a vendetta against the court system stemming from his 1972 conviction on charges of possessing pipe bombs.
 
 
 106
 Not only are judges at risk with the disclosure of their home addresses, but so are many employees in positions of trust and confidence, especially those who occupy high government office and who carry controversial and sensitive responsibilities. Our society's continued recognition of this right is evidenced by the common usage of postal boxes and unlisted telephone numbers and by the universal practice of employers that refuse to release to inquirers an employee's home address or telephone number without the employee's authorization. The Supreme Court has observed that "[c]ongressional concern for the protection of the kind of confidential personal data usually included in a personnel file is abundantly clear." Dep't of Air Force v. Rose, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604-05, 48 L.Ed.2d 11 (1976).
 
 
 107
 The majority objects to a generalized analysis of the privacy interest and instead urges a more narrow definition in terms of release to the Union only. It emphasizes "that only an exclusive bargaining representative may request home addresses under the Labor Statute." Maj. op. at 759. In Department of the Navy we did not adopt such a restricted reading of the privacy interest, and both practical and jurisprudential reasons suggest we do not do so here. As a practical matter, once these home addresses are released to the Union, there is nothing to assure us that the Union or its members may not further disseminate the information. Indeed, the FLRA concedes that "any list of names and home addresses [released to the Union] is subject to uses that may not have been contemplated when it was originally disclosed. For example, the sale or transmittal of such a list for commercial or charitable purposes could, of course, occur." Portsmouth, 37 F.L.R.A. (No. 39) at 533. Local unions have hundreds and sometimes thousands of members, see United States v. Local 560, Int'l Brotherhood of Teamsters 591, 581 F.Supp. 279, 287 (as of May 1982, Local 560 had approximately 10,000 members employed by approximately 425 companies in the metropolitan New Jersey-New York area). There is nothing to foreclose individual members from having access to the information released to the Union. Who can foretell whether a disappointed, embittered, or even emotionally disturbed member may not have access to the disclosed information and use it to harass non-Union employees and their families.[2]
 
 
 108
 The degree of common law respect for privacy depends in part on the extent of dissemination of the particular information which already has occurred. Reporters Committee, 489 U.S. at 763 n. 15, 109 S.Ct. at 1476 n. 15. Partial disclosure of a particular fact, however, will not render it public for all future purposes or authorize disclosure in a significantly different context. Thus, in Reporters Committee, the Court held that the "scattered disclosure of the bits of information contained in a [criminal history] rap sheet" did not justify "revelation of the rap sheet as a whole." Id. at 764, 109 S.Ct. at 1477. Here, although many of these employees' home addresses may be obtained if one already knows their names by consulting a telephone directory, I believe it is highly unlikely that their names, addresses, and identification as Navy employees are anywhere disclosed together without the employees' consent. Under Reporters Committee, the lack of prior disclosure of the requested information as a whole bolsters the conclusion that these employees have an undiluted privacy interest at stake.
 
 
 109
 Furthermore, a home or residential building's address often reveals far more than just where an individual lives; it can identify specific and sometimes personal characteristics about residents. It is the ability of home address lists to communicate specific traits shared by a community which give them considerable commercial value to businesses, solicitors, marketing experts, insurance companies, social scientists, pollsters, and others. Thus, disclosure of one's home address and name could simultaneously divulge to an astute or interested observer significant and highly personal details about one's life as well as render the person and his/her family more easily exposed to commercial, political, social, and ominous safety invasion.
 
 
 110
 Added to the weight of the interest in keeping private one's home address is the concern in preventing the general public from knowing where one works, especially when one's occupation involves sensitive or controversial issues. Here, disclosure of the employees' names and home addresses also would reveal that they work for the Department of Navy, a fact which some employees may not want to be generally known for security or other reasons. The employee is often the best judge of risks to his/her privacy and family safety. The employees' unwillingness to consent to the requested address disclosure sends an important message in weighing any metaphysical public interest in the disclosure.
 
 
 111
 Those employed by a federal agency such as the Navy also may find themselves the unwilling target of the opinions and perhaps the ire of others opposed to the government's general policies or specific conduct. It is one thing to encounter protestors in public forums or even at the workplace; it is quite another to have them confront an employee and possibly his/her family at home in the darkness of the night or in the anonymity of an unsigned letter or package. This scenario would be a realistic possibility if federal employees' names and addresses could be made generally available under the FOIA. See Dep't of State v. Ray, 112 S.Ct. 541 at n. 12 (finding disclosure of interviewees' names "a significant invasion of their privacy because it would subject them to possible embarrassment and retaliatory action"). Of course, one could expect even more threatening consequences to federal employees working in highly security-sensitive positions. The release of employees' names and addresses may be of great significance to federal employees who want to retain control over the dissemination of their names and home addresses to others for reasons supplemental to the ordinary privacy concerns about the location of one's home.
 
 
 112
 This interpretation of the FOIA also supports a decision to use a generalized definition of the privacy interest at stake here. One court has observed that the defining and balancing of interests under the FOIA's Exemption 6 must be conducted at a general level, without particular reference to the requestor's specific uses for the information. United States Dep't of Air Force, Scott A.F. Base v. FLRA, 838 F.2d 229, 233 (7th Cir.), cert. dismissed 488 U.S. 880, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988). This follows from the FOIA's use of general language that "any person" may obtain information. 5 U.S.C. § 552(a)(3). The United States Supreme Court likewise noted, "[T]he [Freedom of Information Act] clearly intended to give any member of the public as much right to disclosure as one with a special interest therein." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975). Thus, when ascertaining the interest in privacy and the public interest in disclosure, we must consider "the several uses to which many people would put the information." Scott A.F. Base, 838 F.2d at 233.[3]
 
 
 113
 The majority asserts that my conclusion leaves federal sector unions at a severe disadvantage when compared to private sector unions, which ordinarily have access to such lists, and that such a variance in treatment is unfounded. On the other hand, there is a distinction between these two categories of workers which reasonably could justify the different treatment accorded the disclosure of address lists. As noted above, persons who work for the federal government have an interest in preserving control over dissemination of their employer identification and home addresses which is different and perhaps more substantial than private sector employees. Federal employees may often discover that they are regarded as the personification of government policies and thus the unwilling targets of persons or groups who oppose those policies. One can reasonably conclude that Congress thought of this distinction when it specifically prohibited in the Labor Statute the disclosure of information protected by other laws, most notably the Privacy Act. There is no such general prohibition under the National Labor Relations Act governing the private sector.
 
 
 114
 In addition, there are numerous other important respects in which public employment is treated differently than private employment under federal law. See Dep't of Navy v. FLRA, 815 F.2d 797, 799 (1st Cir.1987). For example, unlike most private employees, federal employees are not entitled to strike, 5 U.S.C. § 7116(b)(7), and most cannot bargain over wages, which are set by Congress, 5 U.S.C. §§ 7102(2), 7103(a)(14). Federal employees, however, enjoy additional protections in the workplace not granted to private sector employees, namely, those provided by the Bill of Rights in the Federal Constitution. Relevant to this case, the personal information contained in the employment files of federal employees is protected by the Privacy Act; in the private sector, employees are not so protected. It therefore does not follow, as the majority contends, that parity is mandated between federal sector and private sector employees.
 
 
 115
 On the personal side of the balance, therefore, we have the Navy employees' meaningful interest in maintaining privacy in their names, home addresses, and identity as Navy employees. On the public interest side of the balance, we have no FOIA-related interest. Accordingly, I would hold that the disclosure of Navy employees' home addresses without their consent to the union collective bargaining agent is not required by the FOIA because, under Exemption 6, release would constitute an invasion of privacy which is not clearly warranted by any FOIA-recognized public interest in disclosure.
 
 III. DISCLOSURE PERMITTED AS A ROUTINE USE
 
 116
 The routine use exception to the Privacy Act permits the release of records when release is for a purpose which is compatible with the purpose for which the record was collected. 5 U.S.C. §§ 552a(b)(3), (a)(7). For disclosure to be allowed as a routine use, the agency charged with maintaining the system of records must first publish notice of the routine use in the Federal Register. 5 U.S.C. § 552a(e)(4)(D). The FLRA contends that release to unions of employees' names and home addresses constitutes a routine use of those records. However, the OPM, the agency charged with maintaining these personnel records, has taken the contrary position that the routine use exception authorizes release of such records to unions only when there is no other adequate alternative means of contacting the employees.
 
 
 117
 Congress established the OPM, formerly the Civil Service Commission, to "provide leadership in personnel matters throughout the Federal service," 12 Fed.Reg. 1259. The agency maintains office personnel files that contain federal employees' names and home addresses. Concentration in one agency of the responsibility for the record-keeping practices of all the federal agencies encourages the universal observance of federal record retention and disclosure laws such as the Privacy Act and imposes salutary and uniform standards of efficient record handling across all government agencies. Farmers Home II, 23 F.L.R.A. (No. 101) at 794. The Privacy Act provides that routine uses are to be identified and published by the agency which "maintains" the records. 5 U.S.C. § 552a(e).
 
 
 118
 Pursuant to section 552a(e)(4)(D) of the Privacy Act,[4] the OPM has since 1984 consistently identified as a routine use in the Federal Register the disclosure of information to officials of federal sector labor organizations when relevant and necessary to their duties of exclusive representation concerning personnel policies, practices, and matters affecting working conditions. Privacy Act of 1974; Publication of Notices of Systems of Records and Proposed New Routine Use, 49 Fed.Reg. 36,949 (Sept. 20, 1984). The United States Supreme Court has discussed the amount of deference due to the promulgating agency's interpretation of its rules. In Martin v. Occupational Safety and Health Review Commission, the Court stated:
 
 
 119
 It is well established "that an agency's construction of its own regulations is entitled to substantial deference." In situations in which "the meaning of [regulatory] language is not free from doubt," the reviewing court should give effect to the agency's interpretation so long as it is "reasonable," that is, so long as the interpretation "sensibly conforms to the purpose and wording of the regulations." Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers.
 
 
 120
 Martin, --- U.S. ----, ----, 111 S.Ct. 1171, 1175 (citations omitted).
 
 
 121
 The FLRA and the OPM differ in their definition of "necessary" for purposes of the routine use exception. The FLRA takes the position that "necessary" here means the same as "necessary" under section 7114(b)(4) of the Labor Statute, and that release of names and home addresses, because of the perceived unique advantages it provides unions, is per se necessary. Farmers Home II, 23 F.L.R.A. (No. 101) at 794. The FLRA thus refuses to consider the adequacy of alternative means of communication with employees, even in the situation we have here where only the addresses of non-union employees are denied to a union already recognized for collective bargaining purposes. The OPM takes a more restrictive view of "necessary." As noted by the majority, a 1986 amicus brief filed by the OPM and a subsequent letter from the OPM's Director published its opinion that names and home addresses are "necessary" to the unions only if no other adequate means of communication exist.
 
 
 122
 The majority correctly rejects the FLRA's argument that its construction of the OPM's routine use regulation should be accorded greater deference than the OPM's interpretation of its own regulation. Maj. Op. at 763. Nonetheless, the majority rejects the OPM's interpretation of its routine use regulations, not on the basis of their substance or any lack of authority, but solely on the ground that the OPM's method of dissemination of its interpretation is wholly inadequate to notify the public of the interpretation. The majority holds:
 
 
 123
 [W]e will not defer to an agency interpretation of its own unchanged regulation that is confined to an amicus brief and unpublished letter because this method of dissemination is wholly inadequate to notify the public of the agency's interpretation.
 
 
 124
 Id. at 764.
 
 
 125
 This reason for not deferring to an agency's interpretation of its own published regulation has no sound basis. This reason was never raised by the Union or the FLRA in these or, as far as I can discern, in any of the prior litigation with the Department of the Navy. The FLRA has never complained of any prejudice or lack of notice of the OPM's interpretation in the voluminous litigation in which it has been engaged over the privacy interest of federal employees in their names and addresses. In fact, the FLRA itself originally held that federal agencies were not required to release employee home addresses to unions in Farmers Home Administration Finance Office, 19 F.L.R.A. (No. 21) 195 (1985). Here, neither the Union nor the FLRA complains that it has been prejudiced in any manner because the OPM's interpretation of its regulation has not had wider dissemination. Like Minerva, the goddess of wisdom, who is said to have leaped forth from the brain of Jupiter, the question of notice has suddenly burst forth in the majority's written opinion.
 
 
 126
 Failure of an agency to publish its policy is no defense to one who knew of the policy. Perri v. Dep't of the Treasury, 637 F.2d 1332 (9th Cir.1981). Even a failure to publish at all is not sufficient to justify a refusal to defer to an agency's interpretation of its rule when the complaining party "has failed to make an initial showing that he was adversely affected by the lack of publication." Zaharahis v. Heckler, 744 F.2d 711, 714 (9th Cir.1984). The FLRA not only does not, and cannot, complain of a lack of interpretive notice, but it does not contend that it was adversely affected by inadequate publication.
 
 
 127
 The FLRA refuses to defer to the OPM's interpretation of the routine use provision because it lacks the "normal indicia of being an official pronouncement and was plainly litigation-inspired." The United States Supreme Court has indicated that agencies' litigation-inspired positions need not be shown deference "when they are merely appellate counsel's 'post hoc rationalizations' for agency action, advanced for the first time in the reviewing court." Martin, --- U.S. ----, ----, 111 S.Ct. 1171, 1179, (citing Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 473, 102 L.Ed.2d 493 (1988)). Assuming arguendo that the 1986 amicus interpretation was litigation-inspired, the OPM Director's adoption of that interpretation for future application clearly is not a post hoc rationalization. See FLRA v. Dep't of Navy, 941 F.2d at 59. Moreover, the Martin Court noted that agencies frequently interpret regulations by less formal means than rulemaking:Although not entitled to the same deference as norms that derive from the exercise of the Secretary's delegated lawmaking powers, these informal interpretations are still entitled to some weight on judicial review. A reviewing court may certainly consult them to determine whether the Secretary has consistently applied the interpretation embodied in the citation, a factor bearing on the reasonableness of the Secretary's position.
 
 
 128
 Martin, --- U.S. ----, ----, 111 S.Ct. 1171, 1179 (citations omitted).
 
 
 129
 In this case, the OPM consistently has stood by its interpretation of the routine use exception for the past six years. It set forth its interpretation of the routine use provision on home addresses in its amicus brief to the FLRA dated July 14, 1986. On June 25, 1987, the Director of the OPM endorsed the OPM's interpretation in a letter to the Civil Division of the Department of Justice. Although this interpretation has not been formally promulgated as a guideline, the Director of the OPM stated in 1987 that the official interpretation of the routine use exception as set forth in the 1986 amicus brief "will remain in effect pending formal revision and issuance of a new guideline." Other Courts of Appeals have held that the OPM's interpretation is deserving of judicial deference. See FLRA v. United States Dep't of Veterans Affairs, 958 F.2d 503 (OPM's interpretation "is reliable as an indication of OPM's standing view as to what constitutes a 'routine use.' "); FLRA v. U.S. Dep't of Navy, 941 F.2d at 58-60 (showing deference to OPM's interpretation under Martin, 111 S.Ct. 1171, and adopting it as "reasonable" and "consistent with current law in the private sector"); Dep't of Treasury, 884 F.2d at 1454-56 (treating amicus interpretation as authoritative because position reflects view of agency head, and litigation-inspired concerns of hastiness and inadequate opportunity for presentation of conflicting views are not present because OPM Director's adoption of brief as official OPM statement is functionally indistinguishable from OPM's usual procedures for interpreting its routine use notice).
 
 
 130
 Finally, this court has stated that publication of administrative guidelines "is not required when the [agency's] rules are interpretive and not substantive." Kahn v. United States, 753 F.2d 1208, 1222 n. 8 (3d Cir.1985). Under the majority's reasoning, every federal agency would be required to disseminate adequately every interpretive statement so as to give the public, not necessarily parties to the litigation, notice of their content.[5] Especially with an agency such as the OPM with millions of personnel records, this would be impractical and even foolhardy.
 
 IV. CONCLUSION
 
 131
 In sum, the Privacy Act bars the disclosure of the Navy employees' names and home addresses because such disclosure is not authorized by either the Act's FOIA exception or its exception for routine use. The majority has been unable specifically to point to any significant public interest that outweighs the "meaningful interest" in one's home address. Moreover, I can find no legal or other reasonable basis to reject the OPM's interpretation of its regulation pertaining to routine use.
 
 
 132
 Accordingly, I would grant the Navy's petition for review and deny the FLRA's application for enforcement.
 
 
 133
 Circuit Judges HUTCHINSON and NYGAARD join in this dissent.
 
 
 
 [1]
 Section 701(a)(16) of Title VII of the Civil Service Reform Act of 1978, Pub.L. 95-454, 92 Stat. 1192, 5 U.S.C.A. § 7103(a)(16) (1980), also known as the Federal Service Labor-Management Relations Statute (the Labor Statute)
 
 
 [2]
 The units involve the employees of the Navy Ships Parts Control Center, Navy Fleet Material Support Office, Defense Depot, NAVSEA Logistics Center, and the Navy Publishing and Printing Service. The Defense Depot is not a party in this action
 
 
 [3]
 Since Portsmouth, home address cases have also been appealed to the Courts of Appeals for the First, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh and District of Columbia Circuit. These cases likewise involve review of FLRA decisions which incorporated the reasoning of the Portsmouth case. The Court of Appeals for the D.C. Circuit has issued judgment orders in its cases pursuant to its pre-Portsmouth decision of FLRA v. United States Dep't of the Treasury, 884 F.2d 1446 (D.C.Cir.1989), cert. denied, 493 U.S. 1055, 110 S.Ct. 863, 107 L.Ed.2d 947 (1990). United States Dep't of the Interior v. FLRA, Nos. 90-1540, 90-1541, 90-1057, 1991 WL 80511 (D.C.Cir. May 2, 1991). The Courts of Appeals for the First, Second and Sixth Circuits have granted the Navy's petitions for review and have denied enforcement. FLRA v. United States Dep't of the Navy, 941 F.2d 49 (1st Cir.1991); FLRA v. United States Dep't of Veterans Affairs, 958 F.2d 503 (2d Cir.1992); FLRA v. Dep't of the Navy, 963 F.2d 124 (6th Cir.1992). Panels of the Courts of Appeals for the Fourth and Ninth Circuits, conversely, have granted enforcement to the FLRA. FLRA v. Dep't of Commerce, 954 F.2d 994 (4th Cir.1992), vacated and rehearing en banc granted, 966 F.2d 134 (4th Cir.1992); FLRA v. United States Dep't of the Navy, 958 F.2d 1490 (9th Cir.1992). Appeals are still pending before panels of the Courts of Appeals for the Fifth, Seventh, Eighth, Tenth and Eleventh Circuits and the en banc Court of Appeals for the Fourth Circuit
 
 
 [4]
 In full, the disclosure provision of 5 U.S.C.A. § 7114(b)(4) reads as follows:
 (b) The duty of an agency and an exclusive representative to negotiate in good faith under subsection (a) of this section shall include the obligation--
 (4) in the case of an agency, to furnish to the exclusive representative involved, or its authorized representative, upon request and, to the extent not prohibited by law, data--
 (A) which is normally maintained by the agency in the regular course of business;
 (B) which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining; and
 (C) which does not constitute guidance, advice, counsel, or training provided for management officials or supervisors, relating to collective bargaining; ...
 
 
 [5]
 Although the Navy clearly challenged the FLRA's per se approach in its papers before the FLRA, J.A. at 58 p 8(c) (Complaint); 54 p 8(c) (Answer); 27 (Navy's exceptions to the ALJ's decision), its position before us is somewhat difficult to discern. While purporting not to argue the question before the court in banc, counsel for the Navy did state that she intended to preserve it for possible review on certiorari to the Supreme Court. Transcript of Oral Argument at 12. Moreover, in its brief, the Navy asserts that it "ha[s] consistently maintained that the information at issue here is not 'necessary' for 'collective bargaining'.... While we preserve this issue, we do not ask the Court to reexamine it at this time...." Navy's Brief at 15 n. 8. In light of the Navy's consistent position before the FLRA and despite its conflicting indications before us, we conclude that the Navy has adequately presented this issue for our review
 
 
 [6]
 The FLRA had previously taken the position that the disclosure of home addresses is "prohibited by law" under the Privacy Act. Farmers Home Administration Finance Office, 19 F.L.R.A. (No. 21) 195 (1985) (Farmers Home I ). Upon review, the Courts of Appeals for the D.C. and Eighth Circuits remanded their cases to the FLRA for consideration of the routine use exception to the Privacy Act but the Court of Appeals for the Second Circuit reversed, holding that disclosure was warranted under the FOIA exception to the Privacy Act. American Fed'n of Gov't Employees, Local 1760 v. FLRA, 786 F.2d 554 (2d Cir.1986) (AFGE ). Balancing the "not particularly compelling" privacy interest of employees in their home addresses against the expressed public interest in collective bargaining under the Labor Statute, the court concluded that disclosure was warranted
 
 
 [7]
 A number of courts also ruled consistently with Farmers Home II that home addresses were disclosable under the FOIA exception to the Privacy Act. United States Dep't of the Air Force v. FLRA, 838 F.2d 229 (7th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); United States Dep't of Agriculture v. FLRA, 836 F.2d 1139 (8th Cir.1988), vacated on other grounds, 488 U.S. 1025, 109 S.Ct. 831, 102 L.Ed.2d 964 (1989); United States Dep't of Health and Human Services v. FLRA, 833 F.2d 1129 (4th Cir.1987), cert. dismissed, 488 U.S. 880, 109 S.Ct. 632, 102 L.Ed.2d 170 (1988); AFGE, 786 F.2d 554 (2d Cir.1986)
 
 
 [8]
 In NARFE, the D.C. Circuit applied Reporters Committee to a FOIA request by the National Association of Retired Federal Employees for names and addresses of recently retired federal employees. Exemption 6 prohibited disclosure because there was no public interest in disclosure after Reporters Committee. 879 F.2d at 879. It noted that the information sought, addresses of federal annuitants, had significant commercial value and concluded that the identity of the requesting party was irrelevant. Id. Thus, a "significant" privacy interest outweighed the absence of a public interest in disclosure
 
 
 [9]
 It is conceivable that the disclosure of home addresses could further a public interest derivatively, for example, by enabling the union to interview employees at their homes to discover agency activity or misconduct. The Supreme Court recently declined to address the validity of a "derivative use" theory of public interest, United States Dep't of State v. Ray, --- U.S. ----, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991), as has a panel of this court. Landano, 956 F.2d 422 (3d Cir.1992). Because a determination of this issue is unnecessary to the result in this case, we also decline to consider the derivative use theory
 
 
 [10]
 The Navy has not challenged that disclosure of home addresses would not be "compatible with the purpose for which it was collected."
 
 
 [11]
 Although the ALJ specifically found that the Navy physically maintained the home addresses sought, Navy Ships Parts Control Center, No. 2-CA-80243 (F.L.R.A. Sept. 21, 1988) (ALJ's Decision and Order) (reprinted at J.A. 19, 22 p 17), there is no dispute that the OPM retains responsibility for the information. Farmers Home II, 23 F.L.R.A. at 794
 
 
 [12]
 This sequence of events suggests that Director Horner advanced the amicus brief as an official agency interpretation in 1987 in response to the FLRA's holding in Farmers Home II that home addresses must be disclosed under the routine use exception
 
 
 [13]
 We note in passing that there is no contention that the OPM's amicus brief definition of "necessary" for a routine use applies to requests for information other than home addresses. In the event that it might apply to other kinds of information, we are especially concerned that affected persons would not have notice of either the existence or content of the OPM's interpretive rule
 
 
 [14]
 An interpretive rule is one in which an agency asserts its construction of a statute or a regulation. As such, interpretive rules do not have the force and effect of law. United States v. Walter Dunlap & Sons, Inc., 800 F.2d 1232, 1238 (3d Cir.1986). Substantive rules, on the other hand, do carry the force of law and are promulgated by an agency to implement a statute. Id.; Mada-Luna v. Fitzpatrick, 813 F.2d 1006, 1013-15 (9th Cir.1987). In determining whether a rule is interpretive or substantive we may look to the nature of the rule: "If the rule in question merely clarifies or explains existing law or regulations, it will be deemed interpretive." Bailey v. Sullivan, 885 F.2d 52, 62 (3d Cir.1989); see also Batterton v. Marshall, 648 F.2d 694, 705 (D.C.Cir.1980). Substantive or legislative rules by contrast, have substantive legal effect. Batterton, 648 F.2d at 702. "They cannot be set aside by the courts unless found 'arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.' 5 U.S.C.A. § 706(2)(A) (1976)." Id. The Court of Appeals for the D.C. Circuit described an interpretative rule in Batterton in the following way:
 Non-binding action, in contrast, merely expresses an agency's interpretation, policy, or internal practice or procedure. Such actions or statements are not determinative of issues or rights addressed. They express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal housekeeping measures organizing agency activities. They do not, however, foreclose alternate courses of action or conclusively affect rights of private parties.... Unlike legislative rules, non-binding agency statements carry no more weight on judicial review than their inherent persuasiveness commands.
 Id. at 702; see General Elec. Co. v. Gilbert, 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976). In Batterton the court recognized that the distinction between legislative and "non-binding" rules may often have "fuzzy perimeters" confounding easy categorization. Id. at 702. The court therefore suggested looking to the policy behind the APA of the notice and comment rulemaking to categorize the rule properly.
 
 
 [15]
 We note that notice and comment rulemaking appears particularly appropriate in this case. It would seem advisable to have OPM's interpretation of its routine use notice properly recognize and incorporate the FLRA's considerations, as well as the considerations of other interested federal agencies, of the circumstances under which, for the carrying out the responsibilities of each such agency, access to information may be "relevant and necessary."
 
 
 [16]
 The FLRA explains that the "relevant and necessary" language of the routine use first appeared in 1975 in a rule issued by OPM's predecessor, the Civil Service Commission. Civil Service Commission Privacy Act of 1974, 40 Fed.Reg. 54,362 (Nov. 21, 1975). This common language is not surprising in view of the fact that the Chairman of the CSC also chaired the FLRA's predecessor, the Federal Labor Relations Council. See Exec. Order 11491, § 4(a), 3 C.F.R. 861 (1966-1970 Comp.)
 
 
 [17]
 Although the agency's interpretation in Bowen was confined to appellate counsel's representations as distinguished from the OPM director's own adoption of the amicus brief here, the agency's failure to follow through with the promise made in Horner's letter undercuts any confidence in that interpretation
 
 
 [1]
 It may be argued that some "second-stage" FOIA-related disclosure benefit not identified by Department of the Navy could emerge after communication between a union and employees. I agree with the majority that consideration of the derivative use theory is unnecessary. See maj. op. at 757 n. 9
 
 
 [2]
 The FLRA refuses to acknowledge such legitimate privacy concerns. See, e.g., Veterans Admin., Riverside Nat'l Cemetery, 33 F.L.R.A. (No. 39) 316, 317 (1988) (FLRA ordered that home addresses be released even though 22 of the 34 members of the bargaining unit requested that the agency keep their addresses "confidential."); Dep't of the Navy, U.S. Naval Ordnance Station, 33 F.L.R.A. (No. 1) 3, 5 (1988) (Although one employee testified that he had been threatened at his home by a union member three years earlier, the FLRA concluded that none of the employees believed that they would be in imminent danger if the union knew where they lived and thus ordered the release of home addresses to a union that had been denied the home addresses only of those employees who had indicated in writing that they did not want this information released.)
 
 
 [3]
 Curiously, the court in Scott A.F. Base applied its generalized interest analysis only to one side of the balance, the public interest in disclosure. Although it considered the many legitimate and unobtrusive uses which favored disclosure, the court, when weighing the employees' privacy interest, did not likewise generalize its analysis to consider the possible invasive uses of the address lists. Courts may be free to choose the relevant level of generality when conducting judicial balancing of interests; the failure to generalize equally on both sides of the balance, however, can skew the results. See Fried, Two Concepts of Interests: Some Reflections on the Supreme Court's Balancing Test, 76 Harv.L.Rev. 755, 763 (1963)
 
 
 [4]
 This section provides that every "agency that maintains a system of records shall ... (4) ... publish in the Federal Register at least annually a notice of the existence and character of the system of records, which notice shall include ... (D) each routine use of the records contained in the system, including the categories of users and the purpose of such use." 5 U.S.C. § 552a(e)(4)(D)
 
 
 [5]
 "[A] requirement of publication for all adjudicatory opinions which formulate interpretations of general applicability 'would be so impractical that Congress could not have intended it.' 1 K. Davis, Administrative Law Treatise, § 5:11 at 346 (2d ed. 1978). See Nason v. Kennebec County CETA, 646 F.2d 10, 19 (1st Cir.1981) ("Enormous difficulties would be created if every interpretive or policy statement of an agency had to be published.")." Cheshire Hosp. v. N.H.-Vt. Hosp. Service, 689 F.2d 1112, 1123 (1st Cir.1982)